Filed 9/29/21  In re Elijah L. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re ELIJAH L., a Person Coming Under the Juvenile Court Law. | B313061 (Los Angeles County Super. Ct. No. 20CCJP05289) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> TIMOTHY L., <br><br> Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Craig S. Barnes, Judge.  Affirmed.

Joseph D. Mackenzie, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Stephen Watson, Deputy County Counsel, for Plaintiff and Respondent.

_____

The juvenile court found jurisdiction over Elijah L., the only child of Timothy L. (father) and Leslie M. (mother), under Welfare and Institutions Code section 300, subdivisions (a) and (b), and ordered him removed from father's custody.[1]  Mother has not appealed from the juvenile court's orders.  Father contends that the juvenile court erred in two ways when it removed Elijah from his custody, but does not dispute the bases of the jurisdictional allegations or the juvenile court's jurisdictional findings.  We disagree with father's contentions of error and will affirm the juvenile court's orders.

## BACKGROUND

Mother, father, and Elijah came to the attention of the Los Angeles Department of Children and Family Services (DCFS) after the Los Angeles County Sheriff's Department (LASD) responded to a domestic violence report at the motel room where the family was living on August 22, 2020.  As of August 2020, mother and father had been together for about three years.  Elijah was born in April 2019.

_____

[1] Further statutory references are to the Welfare and Institutions Code.

2

On the evening of August 22, 2020, father arrived at the motel room where the couple was living and the couple began arguing. Mother told police that father had returned to the room "late after drinking." According to the LASD incident report, father "became angry and pulled [mother] by the hair from the bed where she was sitting, and onto the floor. When she fell onto the floor, [father] then placed his right knee onto her neck area, which caused difficulty in [mother's] breathing. [Father] removed his knee from [mother's] neck and began strangling her with both of his hands while she was still laying on the floor. [Mother] told [the officer] she felt like[ ] she 'was about to pass out[.]' " After father stopped strangling mother, "she ran outside of the room, carrying [Elijah] . . . who was in his crib asleep at the time of the incident, and waited for law enforcement to show up." The report stated that when LASD asked mother if there had been other domestic violence incidents, mother responded that "there were prior incidents, but no law enforcement was requested." During follow-up interviews with DCFS, mother reported that Elijah was sleeping on a second bed in the motel room during the attack, and father reported that Elijah was awake and playing on the bed.

LASD arrested father and obtained an emergency protective order for mother. Father violated the protective order while he was still incarcerated after the incident by calling mother.

By September 3, 2020, father had been released from jail, and had moved out of the motel room, where mother, Elijah, and mother's sister continued to live. Father moved in with his aunt, where the record indicates he continued to live through at least the jurisdiction and disposition hearing. During her first interview with DCFS, mother told DCFS that she did not intend

3

to pursue charges against father for the attack, but that she did intend to have the emergency protective order extended and to seek a restraining order against father. Father cited mother's protective order as the reason he no longer lived with mother after he was released from custody following the August 2020 incident.

During interviews with DCFS, father explained that he "sometimes goes out with his friends to hang out and have a few beers," and told DCFS that he did that "once a week or once every other week." He also reported that he smokes marijuana daily, but that he "does not care for [Elijah] while he is under the influence." DCFS also discovered that father had been arrested in a domestic violence incident as a minor in 2007 or 2008, was convicted of driving under the influence in 2012, and was again arrested for driving under the influence in 2017.

DCFS filed a petition under section 300, subdivisions (a) and (b) on October 6, 2020 based on domestic violence allegations and based on information it learned about father's drug and alcohol use in interviews following the August 2020 incident. The petition's count a-1 and b-2 each alleged that "[t]he child['s] mother . . . and father . . . have a history of engaging in violent altercations. On or about 08/21/20, the father pulled the mother's hair and threw the mother to the floor. The father pinned the mother down by placing the father's knee on the mother's neck and choking the mother with the father's hands, making it difficult for the mother to breathe, in the presence of the child. The father was under the influence of alcohol. On prior occasions the mother and the father pushed each other. Such violent conduct on the part of the mother and the father endangers the child's physical health and safety and places the child at risk of

4

serious physical harm, damage, and danger." Count b-1 alleged that "[t]he child['s] father . . . has a history of substance abuse including marijuana and is a current abuser of marijuana, which renders the father incapable of providing the child with regular care and supervision. On 09/04/20, the father had a positive toxicology screen for marijuana. The child's mother . . . knew of the father's substance abuse and failed to protect the child in that the mother allowed the father to reside in the child's home and have unlimited access to the child. The child is of such a young age that the child requires constant care and supervision and the father's substance abuse inhibits the father's ability to provide constant care and supervision of the child. The father has a history of criminal convictions of Driving Under the Influence of 0.08 percent. Such substance abuse by the father and the mother's failure to protect the child endangers the child's physical health and safety and places the child at risk of serious physical harm, damage[,] and failure to protect."

At a detention hearing on October 9, 2020, the juvenile court found a prima facie case that Elijah was a person described by section 300, detained Elijah from father, and released Elijah to mother's home. The juvenile court granted father monitored visitation of at least six hours per week, to be monitored by a DCFS-approved monitor in a DCFS-approved setting, and gave DCFS the discretion to liberalize visits. On DCFS's request, however, the juvenile court expressly ordered that mother was not permitted to monitor father's visits.

DCFS's jurisdiction and disposition report indicates that mother and father continued to live in different homes. Father continued to live with his aunt. In December 2020, mother

moved into a different home with father's parents and brother—Elijah's paternal grandparents and uncle.

DCFS reported to the juvenile court that despite the court's visitation order and order that mother not monitor visitation, father "had [at least] two unauthorized visits with the child Elijah, one of which involved a direct lie to the [DCFS] social worker." On November 6, 2020, a new social worker assigned to the case met mother at the motel room where she was still living at the time. Mother introduced the social worker to her " 'friend, Tim[.]' " The social worker later "realized 'Tim' was the father" and contacted mother to notify her that father "is to have monitored visits, [and] she is not to be the monitor." Mother "stated she understands and apologized." In January 2021, father told the social worker that "he did not have time to visit with Elijah because he was busy with his friends," but also learned of "a holiday visit with Elijah that was not arranged or approved by [DCFS] but was reportedly monitored by the [paternal uncle] at a location away from the family home." The social worker again informed mother "of the proper visitation protocol."

The juvenile court held jurisdiction and disposition hearings on January 27, 2021. At the jurisdiction hearing, the juvenile court sustained the petition as pled on all three counts as to both mother and father. On disposition, the juvenile court considered DCFS's recommendation to remove Elijah from father's custody and continue his release to mother. The juvenile court found by clear and convincing evidence that it was necessary to remove Elijah from father. The juvenile court stated on the record supporting his decision to remove Elijah from father: "I'll tell you where there's clear and convincing evidence.

6

The event that transpired—father says the child is awake, on the bed. This is a year-old child, and this event occurs, and this is not—this has an antecedent as well, so I'm concerned that that has not been resolved. And if father has the temerity to do that in the presence of a very young child, there are those risks that have not been properly resolved." After further discussion, the juvenile court specifically found that "continuance in the home of father is contrary to the child's welfare" and found "by clear and convincing evidence there would be substantial danger to the physical health of the child if returned [to father's] home, and no reasonable means by which the child's physical health can be protected without removing the child from the father's physical custody." The juvenile court ordered a 52-week domestic violence program for father, a "full drug and alcohol program," "weekly on-demand testing," anger management counseling, and various other reunification services, as well as continued monitored visitation specifically excluding mother as the monitor.

Father filed a timely notice of appeal; mother did not appeal.

## DISCUSSION

Father contends on appeal that the juvenile court erred when it entered its disposition order—specifically the order removing Elijah from father's custody. First, father contends that the juvenile court erred because it failed to consider removing *father* from the family home as an alternative to removing *Elijah* from father's custody. Second, father contends that the juvenile court erred because it did not state the facts on the record on which it based its decision to remove Elijah from father's custody.

7

We disagree with the way father has characterized the record here, and on that basis disagree with his contentions on appeal.

Section 361, subdivision (c) requires that for a juvenile court to remove a child from a parent's physical custody that it "shall consider, as a reasonable means to protect the minor . . . [t]he option of removing an offending parent . . . from the home." (§ 361, subd. (c)(1)(A).)

Father was incarcerated after the August 2020 incident and the record demonstrates that he never moved back into a home with mother. Mother initially had an emergency protective order that presumably prohibited *any* contact between mother and father, and the record indicates that except for a phone call while he was still in custody, father complied with the terms of the emergency protective order. While the record indicates that father *visited* Elijah in mother's home—in violation of the juvenile court's detention order—there is no indication anywhere in the record, and no assertion at argument in the matter that Elijah was living in father's home or that father and mother had again begun living together.

The juvenile court is not required to engage in exercises that the facts do not suggest or invoke. Here, the juvenile court had no reason to consider removing father from the home because nothing in the record suggests that father lived in the home with Elijah. Removing father from that home would have been both a legal and factual impossibility.

Father's second contention is equally unavailing. Father contends that the trial court failed to state the facts on which it based its decision to remove Elijah from father's custody.

Contrary to father's assertion, the juvenile court stated that it found clear and convincing evidence of domestic violence and unresolved anger issues. "I'll tell you where there's clear and convincing evidence," the juvenile court said. "The event that transpired—father says the child is awake, on the bed. This is a year-old child, and this event occurs, and this is not—this has an antecedent as well, so I'm concerned that that has not been resolved. And if father has the temerity to do that in the presence of a very young child, there are those risks that have not been properly resolved."

Father does not challenge the nature of the allegations, the strength of any particular evidence or the weight the court gave it, or the sufficiency of these particular findings to support the juvenile court's ruling, but rather argues that the juvenile court *did not state the facts on which it based its decision*. We disagree. The reporter's transcript contains the juvenile court's very clear statement regarding what it viewed as father's unresolved domestic violence and anger issues that it believed required removal of Elijah from father's custody.

We will affirm the juvenile court's orders.

## DISPOSITION

The juvenile court's jurisdiction and disposition orders are affirmed.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

BENDIX, Acting P. J.

CRANDALL, J.*

---

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.